1    WO

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                         FOR THE DISTRICT OF ARIZONA

8

9    Roberta Rich,                          No. CV-16-00528-TUC-EJM

10              Plaintiff,                   **ORDER**

11   v.

12   Commissioner      of    Social    Security
     Administration,
13
                 Defendant.
14

15          Plaintiff Roberta Rich ("Rich")[1] brought this action pursuant to 42 U.S.C. § 405(g)

16   seeking judicial review of a final decision by the Commissioner of Social Security

17   ("Commissioner"). Rich raises three issues on appeal: 1) whether substantial evidence

18   establishes that Rich's major depression is a severe impairment; 2) whether substantial

19   evidence supports the Administrative Law Judge's ("ALJ") light Residual Functional

20   Capacity ("RFC") assessment; and 3) whether the ALJ committed harmful error by

21   adopting a light RFC with no mental limitations. (Doc. 25).

22          Before the Court are Rich's Opening Brief, Defendant's Response, and Rich's

23   Reply. (Docs. 25, 26, & 27). The United States Magistrate Judge has received the written

24   _____

25          [1] As an initial matter, the Court notes that Rich's attorney filed a Motion to
     Substitute Party (Doc. 28), stating that Rich passed away on March 20, 2017. (Doc. 28).
26   Because the Court finds that the Commissioner's decision should be affirmed, the motion
     is denied. Rich's attorney also filed a Motion to Amend Caption (Doc. 29), requesting to
27   amend the defendant's name from "Carolyn W. Colvin, Acting Commissioner of the
     Social Security Administration" to "Acting Commissioner of the Social Security
28   Administration." Because the case caption already reflects the defendant's name as
     "Commissioner of Social Security Administration," the motion is denied as moot.

consent of both parties and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure. For the reasons stated below, the Court finds that the Commissioner's decision should be affirmed.

## I.    Procedural History

Rich filed an application for Disability Insurance Benefits ("DIB") on July 27, 2012. (Administrative Record ("AR") 19, 50). Rich alleged disability beginning January 5, 2008[2] based on diabetes, neuropathy, kidney disease, heart disease, and depression. (AR 50, 170). Rich's application was denied upon initial review (AR 49, 63) and on reconsideration (AR 64, 79). A hearing was held on October 24, 2014 (AR 34), after which ALJ Peter J. Baum found, at Step Four, that Rich was not disabled because she was able to perform her PRW as an information clerk (AR 19). On June 14, 2016 the Appeals Council denied Rich's request to review the ALJ's decision. (AR 1).

Rich's date last insured ("DLI") for DIB purposes is December 31, 2012. (AR 19, 155). Thus, in order to be eligible for benefits, Rich must prove that she was disabled during the time period of her amended alleged onset date ("AOD") of November 1, 2012 and her DLI of December 31, 2012.

## II.    Factual History

Rich was born on May 1, 1963 (AR 50), making her 49 at the amended AOD of her disability (AR 239). Rich earned a G.E.D. and attended some college but did not complete a degree. (AR 39, 171). She worked primarily as a customer service representative and also did home sales for Avon and Tupperware and internet sales on eBay. (AR 155, 172, 183).

### A.    Treating Physicians[3]

On December 10, 2007 Rich saw Dr. Rothe for abdominal pain and he noted no

---

[2] Rich subsequently amended her AOD to November 1, 2012. (AR 19, 239). Plaintiff's Opening Brief incorrectly states that Rich amended her AOD to May 1, 2013. (Doc. 25 at 3).

[3] While the undersigned has reviewed the entirety of the record in this matter, the following summary includes only the information most pertinent to the claims at issue in this appeal.

unusual anxiety or evidence of depression. (AR 882–83).

On January 7, 2008 Dr. Rothe noted Rich was having problems with her hips and a heel bruise. (AR 261).

On February 11, 2008 Dr. Rothe noted Rich's mood was normal. (AR 259).

On March 3, 2008 Dr. Rothe noted that other than her toe bothering her, Rich was not ill, and her mood was normal. (AR 257).

On March 5, 2008 Rich was seen for a follow-up to discuss CAT scan results and a toe infection. (AR 254). Dr. Rothe noted she was in moderate distress and her mood was normal.

On March 6, 2008 Rich had a follow-up for her aortic stenosis. (AR 272). Dr. Mendoza noted that symptomatically she was not any worse off than she was a year before, and recommended a revascularization procedure. Because her demeanor was "somewhat aggressive and not very pleasant," Dr. Mendoza suggested Rich find a vascular surgeon more suitable to her.

A March 7, 2008 addendum to the February 29, 2008 CTA abdomen report notes that a comparison to the prior CT scan from March 2007 shows worsening atherosclerotic stenosis of the distal abdominal aorta. (AR 297–98).

A March 17, 2008 letter from Pima Heart notes that Rich was positive for fatigue, claudication, post-prandial abdominal discomfort and nausea, anxiety and stress related to her medical problems, and muscle aches. (AR 269). Dr. Tuli noted she was mildly anxious but appropriate in her answers. (AR 270). He assessed heart disease and recommended a stress test and an echocardiogram.

On March 19, 2008 Rich reported nausea, indigestion/heartburn, stress, and anxiety. (AR 266–67). The doctor documented no unusual anxiety or evidence of depression, and assessed generalized abdominal pain and hiatal hernia. (AR 268).

A March 25, 2008 stress test had normal results. (AR 303).

On March 27, 2008 an echocardiogram showed normal left ventricular size and ejection fraction, and no valvular pathology. (AR 301).

- 3 -

On April 3, 2008 Dr. Rothe noted Rich was doing well for the most part, her mood was normal, and her feet were much improved since quitting smoking and starting Plavix. (AR 252).

An April 7, 2008 letter from Arizona EndoVascular Center notes that Rich's CT scan showed worsening of severe atherosclerotic stenosis of the distal abdominal aorta. (AR 350). Dr. Berens recommended an aortoiliac bifurcated graft. He also noted that she had moderate left renal artery stenosis that was not severe enough to warrant intervention.

On April 17, 2008 Rich had an aortoiliac bifurcated graft procedure. (AR 274).

A May 5, 2008 letter from Arizona EndoVascular Center states that Rich was two weeks post aortoiliac bypass and was doing well overall and able to walk without restriction or pain. (AR 265).

On May 27, 2008 Rich was seen for a follow-up after her aortic bypass. (AR 329). The nurse documented abdominal pain, probably related to increased activity, and nausea and dizziness due to a medication change.

On June 2, 2008 Rich was seen for a follow-up for hypertension, diabetes, and hypothyroidism. (AR 249). She reported mild abdominal pain/discomfort but said her hips did not hurt and her legs were perfect. (AR 249–50). Dr. Rothe noted she was doing well for the most part and that her mood was normal. (AR 250).

A June 17, 2008 letter from Arizona EndoVascular Center notes that Rich was two months postoperative and still experiencing nausea and postprandial discomfort. (AR 264).

An August 19, 2008 letter from Arizona EndoVascular Center notes that Rich had no specific postoperative problems from the aortobifemoral bypass. (AR 358). She was smoking again and reported right upper quadrant pain, left thigh and neck spasms, light headedness, and dizziness. Dr. Berens stated that he could not isolate a particular problem related to her vascular disease, and that her symptoms were musculoskeletal.

On April 30, 2009 Rich was seen at Arizona Kidney Disease & Hypertension Center. (AR 315). Dr. Cohen described her as "a very angry woman" and "was just

- 4 -

complaining as soon as she walked into the room." He also noted that she was "very unpleasant" but did calm down, and that she "was obviously in a very bad mood." (AR 316). Rich said she had no problems with diabetes, denied numbness in her legs, had no pain, but reported she always felt terrible. (AR 315). She had no neuropathy symptoms, no claudication, and no psychiatric problems. (AR 316). Dr. Cohen noted her kidney diseases was not very bad and that she did not need dialysis, but Rich kept talking about getting a transplant. He recommended that she better control her blood pressure and blood sugars.

On August 1, 2009 Rich went to the ER with a complaint of left jaw pain radiating to the left arm and chest pain. (AR 527). The report notes that while her pain was not necessarily typical for cardiac pain, she had multiple risk factors and her symptoms were relieved with nitroglycerin. She left against medical advice due to lack of insurance/money.

On August 4, 2009 Rich was seen for a complaint of chest pain. (AR 395). She reported that the pain began 1 week ago, occurred every 1 to 2 days, lasted 1 hour, and was moderate. Review of systems was positive for chest pain, nausea, diaphoresis, anxiety, and increased stress. The impression was chest pain, unspecified, non-cardiac, likely secondary to stress. (AR 396).

On September 16, 2009 Rich had no claudication symptoms, was in no acute distress, her gait and stance were normal, and her cardiovascular and abdomen findings were normal. (AR 312–14). A segmental blood pressure examination showed mild arterial diseases for the right ABI and no significant arterial disease for the left ABI. (AR 318). A lower arterial Doppler showed no significant abnormalities. (AR 320).

On October 28, 2009 Rich saw Dr. Los for a new patient appointment. (AR 678). Rich stated she hadn't checked her sugars for more than 2 years and that she saw Dr. Tuli and Dr. Berens for peripheral artery disease. Physical findings included joints with full range of motion, no edema, tenderness, or crepitus, positive Hawkins and Neer test on right, normal gait, and mood unhappy with congruent affect. (AR 679). Dr. Los assessed

diabetes uncertain control, hypertension stable, hypothyroidism labs ordered, hyperlipidemia tolerating meds, and peripheral artery disease.

On November 5, 2009 Rich saw Dr. Los with a complaint of heel pain, present for 5 days, and also reported pain in her right shoulder. (AR 676). Exam of the feet revealed no obvious bony deformities; Dr. Los assessed plantar fasciitis and prescribed Ultram for heel and shoulder pain. (AR 677).

On November 30, 2009 Rich saw Dr. Los and reported her pain was much improved. (AR 673). Findings on exam included joints with full range of motion, no edema, tenderness, or crepitus, normal gait, and mood unhappy with congruent affect. (AR 674). Dr. Los assessed diabetes poor control, hypertension stable, and hyperlipidemia tolerating meds.

On December 30, 2009 Rich saw Dr. Los for a diabetes check. (AR 670). Physical findings included joints with full range of motion, no edema, tenderness, or crepitus, normal gait, and mood unhappy with congruent affect. (AR 672). Dr. Los assessed diabetes improved control, hypertension stable, kidney disease stable, and hyperlipidemia tolerating meds.

On February 27, 2010 Rich went to the ER with a complaint of feeling bad, run down, palpitations, and chest pains. (AR 507). She reported symptoms started three weeks ago when her brother committed suicide. The impression was palpitations and chest pain secondary to emotional anxiety with a recommendation that Rich be admitted for further treatment, but she left against medical advice. Rich went back to the ER later that day with a complaint of chest discomfort; she actually came in because she could hear her heartbeat in her ear and because she had some epigastric discomfort, and then denied any actual chest pain or discomfort. (AR 497). Her affect was appropriate, though she was initially somewhat agitated. (AR 498). The doctor assessed atypical chest pain, actually epigastric discomfort with negative cardiac enzymes, likely a GI issue because it did respond to Mylanta.

On March 2, 2010 Rich saw Dr. Los for a follow-up after she was hospitalized for

anemia. (AR 667). Rich was calm with a normal affect. (AR 669). Dr. Los assessed anemia likely due to a GI bleed and referred Rich for a GI evaluation.

On March 3, 2010 Rich had a GI consultation. (AR 686). Rich was described as pleasant with appropriate mood and affect. (AR 686–87).

On March 4, 2010 Rich was seen at Tucson Endocrine Associates. (AR 683). Rich reported a 26 year history of diabetes and a lot of grief after her brother recently committed suicide. The impression was diabetes uncontrolled, clinical significant neuropathy absent, increased coronary risk (smoking, diabetes, peripheral vascular disease, and weight), and kidney disease stage unknown. (AR 683–84).

On March 23, 2010 Rich saw Dr. Los for a follow-up. (AR 663). Physical findings included joints with full range of motion, no edema, tenderness, or crepitus, normal gait, and mood unhappy with congruent affect. (AR 665).

On March 26, 2010 Rich went to the ER for a cough and fever. (AR 474). She was described as pleasant and cooperative and admitted for treatment of pneumonia. (AR 476).

On June 29, 2010 Rich reported right shoulder pain after sleeping on it wrong. (AR 652). Physical findings included full range of motion, no edema or crepitus, right shoulder positive for impingement, normal gait, and mood unhappy with congruent affect. (AR 654). Dr. Los assessed severe anemia likely from B12 deficiency, PT referral for right rotator cuff syndrome, diabetes improved control, kidney disease stable, and hyperlipidemia tolerating meds.

A July 26, 2010 letter from Ideal Rehabilitation recommends that Rich have PT for her right shoulder pain, to consist of home exercises and stretching. (AR 691). A discharge note dated September 3, 2010 states that Rich reported she was doing really well and had full range of motion (other than being able to reach behind to fasten her bra) and no pain. (AR 699).

On August 23, 2010 Rich saw Dr. Los for a follow-up. (AR 649). Findings on exam included joints with full range of motion, no edema or crepitus, right shoulder

positive for impingement, normal gait, and depressed mood with full affect. (AR 651). Dr. Los assessed anemia resolved, right rotator cuff syndrome improved, diabetes improved control, kidney disease stable, hyperlipidemia tolerating meds, and self-referral to behavioral health for depression.

On September 15, 2010 Rich saw Dr. Los for sciatica and reported pain radiating down her right leg to her foot, and pain in right wrist. (AR 646). Physical findings included no back or hip tenderness, deep tendon reflexes diminished bilaterally, moderately positive straight leg raise ("SLR") on right, and right arm positive Tinel sign. (AR 647). Dr. Los assessed lumbosacral strain with sciatica and carpal tunnel syndrome, right wrist, and recommended heat for the back and a wrist brace.

On October 14, 2010 Rich reported having only intermittent shoulder pain after going to PT, right low back pain that comes and goes, and she did not go to behavioral health because she denied depression. (AR 642). Findings on exam included joints with full range of motion, no edema or crepitus, negative SLR bilaterally, right shoulder positive for impingement, right trochanter tender to palpation ("TTP"), normal gait, and depressed mood with full affect. (AR 644). Dr. Los assessed right rotator cuff syndrome improved, hypertension high, right trochanteric bursitis and possible sciatica, diabetes improved control, kidney disease stable, hyperlipidemia stable, and depression self-referral to behavioral health.

On October 18, 2010 Rich was seen for concerns about her right big toe turning purple at times. (AR 393). Review of systems findings were all negative except for anxiety. (AR 393–94). Rich had not followed up with Dr. Berens for her peripheral vascular disease due to insurance reasons and was not taking her cholesterol medication due to cost. (AR 394).

On October 19, 2010 Rich had an ABI with exercise test. (AR 392). The impression was normal left lower extremity ABI; normal left lower extremity exercise ABI; abnormal right lower extremity ABI consistent with moderate obstructive peripheral vascular disease; and abnormal right lower extremity exercise ABI consistent with mild

to moderate obstructive peripheral vascular disease.

On November 11, 2010 a bilateral arterial duplex showed no focal stenosis. (AR 391).

On November 17, 2010 a CTA of the abdomen, pelvis, and lower extremity showed occlusion of the right limb of the aortobiiliac bypass graft. (AR 704).

On January 16, 2011 Rich went to the ER for chest and neck discomfort and was described as a "hostile and angry female in no obvious physical distress." (AR 442, 444). She went to the ER 5 days earlier when her symptoms started but left against medical advice. (AR 442, 444). Her cardiac markers were mildly positive, there were no obvious changes in her EKG, and x-rays and CT scan of the chest were normal. (AR 442, 444, 456, 458). She was discharged home in stable and improved condition, with a recommendation to quit smoking and follow-up with her doctors. (AR 442–43).

On January 25, 2011 Rich was seen for coronary artery disease and reported chest pain, claudication, and apprehension. (AR 388–39). Other systems and physical exam findings were normal. (AR 389).

On March 28, 2011, Rich was seen for a complaint of intermittent claudication and reported waking almost every night with burning leg pain. (AR 334). Rich reported fatigue and sleep disturbances secondary to pain, and no anxiety or depression. (AR 335). The nurse noted normal mood and affect, and assessed atherosclerosis of the extremities with rest pain. (AR 336). Rich was referred for further testing and told that smoking cessation was mandatory. (AR 337).

On April 4, 2011 Rich went to the ER complaining of right leg pain and stated she had a femoral artery occlusion. (AR 637). She ran out of Oxycodone at home and was unable to bear the pain. Findings on exam were largely normal, with some TTP of the calf without swelling, and palpable but diminished pulses in the entire right lower extremity. (AR 638–39). A CT of the abdomen and pelvis showed occlusion of the right common iliac segment of the aorta bilateral iliac graft. (AR 639). Rich's leg pain improved significantly after her blood sugar was replenished in the ER and she was

normal glycemic. (AR 640).

On April 5, 2011 Rich reported she could not get her lab work done due to lack of insurance. (AR 386). She had no symptoms attributable to valvular heart disease. Review of systems and physical exam findings were largely normal. (AR 387).

An April 12, 2011 letter from Arizona EndoVascular Center states that Rich was evaluated for severe right leg claudication. (AR 363). Dr. Berens opined that the "right aortoiliac graft limb is occluded and probably shut down over six months ago," and recommended a left-to-right femoral-femoral bypass.

On May 6, 2011 Rich had a left-to-right femoral-femoral bypass. (AR 364).

A May 23, 2011 letter from Arizona EndoVascular Center notes that Rich's right leg pain had improved since the surgery, that she was experiencing dysesthesias along her thighs probably related to the incisions, and that she had bilateral hip pain with ambulation. (AR 366).

On June 3, 2011 Rich was seen for palpitations. (AR 384). Review of systems was positive for dyspnea, palpitation, and diaphoresis. The impression was palpitations, etiology unknown, with Rich to monitor and report her symptoms. (AR 385).

On June 6, 2011 Rich reported she was more active and climbing stairs, but also had some knee and hip pain. (AR 338). Her cardiovascular and psychiatric findings were normal. (AR 339). The assessment was atherosclerosis of the extremities, and left hip and knee pain. (AR 340).

On June 20, 2011 Rich was seen for a surgery follow-up and reported bilateral lower extremity ("BLE") paresthesia in her thighs and left knee. (AR 725). The assessment was renal artery stenosis, diabetes, and paresthesia not related to surgery with a recommendation to follow-up with Dr. Los. (AR 727).

On June 23, 2011 Rich saw Dr. Los for pain in her legs and requested narcotics. (AR 630). Findings on exam included allodynia in the lower extremities, negative SLR bilaterally, normal gait, and depressed mood with full affect. (AR 632). Dr. Los assessed chronic pain likely diabetic neuropathy, hypertension stable, anemia resolved, diabetes

uncertain control, right rotator cuff syndrome improved, tolerating meds for hyperlipidemia, and self-referral to behavioral health for depression

On July 25, 2011 Rich reported chronic back and right shoulder pain were worse, and new right knee pain. (AR 626). Findings on exam included allodynia in the lower extremities, negative SLR bilaterally, full range of motion in right shoulder and knee, right knee TTP, normal gait, and normal psychiatric findings. (AR 628). Dr. Los assessed chronic pain likely diabetic neuropathy, hypertension with kidney disease stable, anemia resolved, diabetes uncertain control, right rotator cuff syndrome stable, tolerating meds for hyperlipidemia, right knee sprain, and self-referral to behavioral health for depression. He also referred Rich to a pain specialist for her chronic back pain. (AR 629).

On June 20, 2011 Rich reported BLE paresthesia in her thighs and left knee. (AR 341). Her physical and psychiatric findings were normal, and the nurse noted that the paresthesia was probably not related to the recent femoral to femoral graft surgery. (AR 342–43).

On August 8, 2011 Rich had an initial consultation at Pain Care Center. (AR 729). She reported back and lower extremity pain that started 5 or 6 years ago, she thought due to her diabetes. The pain ranged from 5–10/10 and was usually 8 or 9. Rich complained of arm, back, elbow, foot, hand, hip, knee, leg, neck, shoulder, and wrist pain; muscle cramps; arthralgias; pins and needles; numbness and weakness; and mood changes. (AR 731). Rich was described as pleasant and calm, and on exam the doctor found positive SLR bilaterally, normal sensation to touch in BLE except for tingling in the anteromedial thighs, and motor strength 5/5 in BLE. (AR 731–32). The doctor ordered a lumbar x-ray and MRI, prescribed Hydrocodone for pain and Nortriptyline for insomnia and pins and needles, and recommended coenzyme Q10 and omega-3 supplements. (AR 733).

On August 23, 2011 x-rays of the lumbar spine showed minimal spurring along the anterior lumbar spine, normal alignment, no evidence of spondylolisthesis, and no hypermobile segments with flexion and extension. (AR 735). A MRI on the same date showed some mild marrow heterogeneity and an abdominal aortic aneurysm but was

otherwise normal. (AR 736).

On September 24, 2011 Rich went to the ER with a complaint of moderate epigastric pain radiating into the chest and left shoulder. (AR 623). Rich stated she took 6 nitro over a few hours and the pain resolved. On exam, lungs and heart were normal, chest x-ray normal, and EKG was normal. (AR 624). The report notes that Rich's symptoms were likely related to reflux and the fact that she ran out of Prilosec, and the doctor agreed that it was not unreasonable for Rich to go home rather than be admitted for further cardiac evaluation. (AR 624–25).

On October 4, 2011 Rich was seen at Tucson Endocrine Associates. (AR 740). The nurse assessed diabetes, uncontrolled, and major depressive disorder, recurrent episode, mild. Rich reported chest pain at rest, every 2 weeks, relieved with nitroglycerine, and depressed mood. (AR 741).

On October 10, 2011 Rich saw Dr. Los for a follow-up. (AR 811). Findings included allodynia in the BLE, negative SLR bilaterally, full range of motion in right shoulder and knee, and right knee TTP. (AR 813). Dr. Los noted that her chronic pain was likely diabetic neuropathy and that narcotics were not the proper treatment and he would refer her to a pain specialist. He also assessed diabetes poor but improved control, hypertension with kidney disease stable, anemia resolved, right rotator cuff syndrome stable, and tolerating meds for hyperlipidemia, and prescribed Fluoxetine for depression.

An October 11, 2011 letter from Arizona EndoVascular Center states that Rich had BLE shooting pains that had improved with Nortriptyline at night; she also had pain during the day occurring unpredictably while sitting, standing, or walking. (AR 371). Dr. Berens noted no evidence of significant arterial insufficiency; a recent MRI of the lumbar spine showed suspected abdominal aortic aneurysm, which was most likely her aortic graft; and a June 2011 duplex of the aortic bifurcated graft was normal other than a moderately elevated velocity in the right renal artery. He recommended no further studies. A bypass graft duplex on October 11, 2011 showed velocities were in normal limits. (AR 372).

On October 17, 2011 Rich was positive for acid reflux and depression; physical exam findings were normal. (AR 382–83).

On October 27, 2011 Rich had no cardiovascular problems and a normal gait, and was positive for muscle aches and pains. (AR 615–16).

On November 4, 2011 Rich went to the ER after tripping and falling and hitting her left hip. (AR 434). A left hip x-ray was negative.

On November 10, 2011 Rich had allodynia in the lower extremities, negative SLR bilaterally, left knee and lateral hip TTP, normal gait, and normal psychiatric findings. (AR 609).

On November 30, 2011 Rich had a new patient evaluation at Desert Pain & Rehab Specialists. (AR 788). Her main complaint was bilateral thigh pain secondary to a postsurgical condition, and a history of low back pain. Rich reported her average pain was 8/10 and ranged from 5–10/10; bending, walking, cleaning, and physical activity made it worse. On examination, Rich had 5/5 strength bilaterally in the upper and lower extremities, positive Spurling sign and complaints of pain with neck rotation, small mass of fluid on both knees, and diminished sensation on both thighs to the knees. The doctor recommended Lyrica, Percocet, PT, and MRI of the neck.

On December 13, 2011 Rich had a normal exam at Tucson Endocrine Assoc. and reported no depression. (AR 751–53).

On December 16, 2011 Rich denied claudication and was remaining active without exertional problems, and had no symptoms attributable to valvular heart disease. (AR 380). Findings on physical exam were normal. (AR 381).

On December 30, 2011 Rich had a follow-up with Desert Pain & Rehab. (AR 787). She reported her average pain with medication was 7/10, 4/10 at best, and 10/10 at worst. On exam, Rich was antalgic when walking and had extremely decreased vibratory sense through her lower extremities consistent with diabetic peripheral neuropathy. The doctor prescribed Cymbalta.

A January 3, 2012 letter from Arizona EndoVascular Center notes that Rich had

no significant renal artery stenosis and Dr. Berens counseled her again about smoking cessation. (AR 374–76).

On January 24, 2012 Rich reported that Cymbalta and Lyrica had improved her pain and depression. (AR 764). The assessment was diabetes improved sugars, hyperlipidemia very near goal, benign hypertension, and kidney disease controlled. (AR 766).

On January 27, 2012 Rich had a follow-up with Desert Pain & Rehab. (AR 784). She reported her average pain with medication was 5–6/10 but sometimes up to 8/10. She was walking with a normal gait and her pes anserine bursa was extremely painful to palpation. An EMG study was completely normal. The doctor recommended a right leg pes anserine cortisone injection. Rich received a bursa injection on March 6, 2012 and had immediate relief. (AR 781).

On April 2, 2012 Rich saw Dr. Los for a follow-up of her chronic problems. (AR 602). Physical findings included allodynia in the lower extremities, negative SLR bilaterally, left knee and lateral hip TTP, normal gait, and normal psychiatric findings. (AR 604).

On April 11, 2012 Rich was seen for a hypertension follow-up. (AR 377). She denied claudication and had no symptoms attributable to valvular heart disease. Review of systems and physical exam findings were normal. (AR 377–78).

On May 17, 2012 Rich had a follow-up with Desert Pain & Rehab. (AR 778). She reported her average pain was a 4–6/10 and was doing much better since the injection. She was walking with a normal gait and was not having any pes anserine bursitis or hip bursitis pain. The doctor noted that her medications were stable and that it did not appear that she needed another injection.

On June 8, 2012 Rich went to the ER for chest and ear pain. (AR 409). Her lab work, cardiac markers, chest x-ray, and EKGs were normal, and the pain was likely related to sinus congestion. (AR 409–10).

On June 22, 2012 Rich went to the ER for abdominal pain. (AR 402). She reported

pain for 1 week, throbbing, colicky in nature, intermittent, worse with movement and better with rest. A CT showed mild sigmoid diverticulosis, midline ventral abdominal hernia, and small lower abdominal aortic aneurysm. (AR 407). Her symptoms resolved at the ER and Rich asked to be discharged home. (AR 402). The impression was musculoskeletal back pain, flank pain, sciatica, and abdominal aortic aneurysm.

On June 28, 2012 Rich was seen for a follow-up after her hospitalization. (AR 596). She reported sharp low back pain radiating down the left leg. Findings on exam included joints with full range of motion, no edema, negative SLR bilaterally, normal gait, and mood calm with normal affect. (AR 598). Dr. Los assessed back spasms/chronic pain, doing well, and follow-up with Dr. Farr.

On July 31, 2012 Rich reported worsening diffuse pain, and pain and swelling in her left wrist/forearm for 2 weeks. (AR 591). Findings on exam were mild diffuse edema left wrist/hand, normal gait, and mood calm with normal affect. (AR 593). X-rays of the left forearm and wrist on August 1, 2012 were normal. (AR 772–73).

On September 17, 2012 Rich had a rheumatology evaluation. (AR 824). She reported joint pain for 2–3 years, with an increase in pain for the last 3–4 months, and pain mostly in her legs, low back, and hips. Findings on exam included normal ROM in all joints and normal gait. (AR 824–25). Rich was described as "pleasant" and denied depression or panic attacks. The assessment was: "Clinically, the patient does not have active synovitis to suggest an inflammatory process at this time. Her [rheumatoid factor] was only marginally elevated at 17 (normal <14) and her CCP was normal. She has diffuse pain which would be seen with long-term diabetes mellitus and neuropathy." (AR 825).

On September 21, 2012 a bilateral wrist ultrasound showed no erosive arthropathy of the wrists. (AR 834). An x-ray of the pelvis showed "coxa profunda bilaterally which is associated with femoroacetaular impingement" and no fracture, arthritis, or erosion. (AR 835). X-rays of the hips, feet, sacroiliac joints, and hands and wrists were normal. (AR 836–39).

On October 11, 2012 Rich reported pain mostly in her hips and low back, with difficulty walking secondary to pain. (AR 831). Findings on exam included pleasant, normal gait, no acute synovitis in the hands or feet, significant tenderness with movement of both hips, and difficulty with straight leg test. The assessment was: "I do not see much evidence to suggest an inflammatory arthritis or rheumatoid arthritis[]" and it was recommended that Rich see a sports orthopedist. (AR 832).

On February 8, 2013 Rich was seen at Desert Pain & Rehab for a medication follow-up and EMG. (AR 848). Her average pain with medication was 8/10 and she walked with an antalgic gait. Dr. Los increased morphine and Lyrica and refilled oxycodone, and noted Rich seemed to be having more myelopathy signs with weakness and numbness in the legs, and was falling.

On March 1, 2013 Rich was positive for flank pain, and lack of feeling and pain in her feet/legs. (AR 1114).

On March 5, 2013 a MRI of the lumbar spine showed mild degenerative disease without significant central canal narrowing in the lumbar spine, and a small abdominal aortic aneurysm likely not significantly changed since the August 23, 2011 MRI. (AR 856).

On April 1, 2013 Rich reported left calf pain, constant and fluctuating, aching and dull. (AR 1106). Review of systems was negative for chest pain and palpitations, negative for back and joint pain, and negative for anxiety and depression, and positive for swelling. (AR 1108). Dr. Doe noted that Rich became agitated and threatened to sue if she did not get refills for her medications. (AR 1110). He reported: "Patient is irritated for reasons I do not know. This is my first encounter with this patient but I had very little chance to establish a good rapport because she created a hostile atmosphere not conducive for any meaningful interaction." (AR 1110).

On May 16, 2013 Rich was negative for chest pain and palpitations, negative for back and joint pain, and negative for anxiety. (AR 1102).

On June 10, 2013 Rich reported right knee pain for one week, worsening, and

improved diabetes. (AR 1095). Review of systems was negative for chest pain and palpitations, negative for back pain, negative for extremity weakness, numbness, and tingling, negative for anxiety and depressed mood, and positive for crepitus, joint tenderness, limping, and joint pain. (AR 1097). X-rays of the right knee showed no acute fracture or dislocation, and a moderate size knee joint effusion. (AR 1119).

On August 5, 2013 Rich reported increased knee pain and claudication pain in her thighs, and average pain 6/10 with medication. (AR 971). The assessment was bilateral knee pain from osteoarthritis, and thigh pain from peripheral vascular diseases and fem/pop bypass. Dr. Farr noted her medications were stable and recommended pool therapy.

On September 25, 2013 Rich's diabetes and hypertension were stable, and she reported daily hand pain. (AR 1089). She was negative for chest pain, muscle weakness, extremity weakness, gait disturbance, numbness, and depressed mood, and positive for joint pain and back pain. (AR 1090–91).

On October 4, 2013 x-rays of the hands indicated no acute osseous abnormality or significant degenerative changes. (AR 1118).

On December 4, 2013 Rich was negative for chest pain and palpitations, negative for anxiety and depressed mood, and positive for pain. (AR 1084). Rich reported pain 6/10 and the doctor assessed hand pain likely due to osteoarthritis. (AR 1085, 1087).

On January 8, 2014 Rich's diabetes was stable. (AR 1075). Review of systems was negative for chest pain, muscle weakness, extremity weakness, gait disturbance, numbness, and depressed mood, and positive for back pain. (AR 1077).

On January 25, 2014 Rich was negative for chest pain, claudication, edema, and palpitations. (AR 1072).

On February 18, 2014 Rich's diabetes was improving. (AR 1063). Review of systems was negative for chest pain, edema, palpitations, joint pain, depressed mood, and depression. (AR 1066).

On May 6, 2014 Rich was seen at Pima Heart. (AR 949). She was positive for

claudication, edema, heartburn, dysesthesias, and joint pain, and negative for anxiety, depression, and insomnia. (AR 951). Findings on exam included normal range of motion, muscle strength, and stability in all extremities with no pain, and normal neurologic and psychiatric findings. (AR 953).

On May 9, 2014 Rich had no chest discomfort suggestive of ischemia. (AR 956). She was positive for claudication and numbness in extremities, and negative for depression. (AR 957).

On August 11, 2014 Rich reported leg pain, abdominal pain, arthritis, back pain, and occasional depression. (AR 1052). Findings on exam included diminished pedal pulses bilaterally, edema of the lower extremities, waddling gait, grossly normal behavior, and no anxiety or depression. (AR 1054).

On August 14, 2014 x-rays of the left knee showed mild degenerative arthrosis. (AR 1062).

On November 19, 2014 Rich went to the ER for a UTI and epigastric pain. (AR 1320). She claimed the doctors gave her something that made her feel bad and made her sick so that she would stay in the hospital longer. (AR 1320–21). She left the hospital and returned later the same day, complaining of severe indigestion. (AR 1322). Rich's symptoms completely resolved with GI medications. (AR 1326). She denied having coronary artery disease but agreed to be admitted for cardiac evaluation due to elevated troponin levels. Her echocardiogram was normal and chest x-rays showed no acute cardiopulmonary process. (AR 1341–42). A psychiatric consult noted Rich was overall competent and had good family support, and a likely diagnosis would be delusional disorder, NOS. (AR 1336). Rich was described as being upset due to services not moving fast enough, and her family reported that she was negatively sensitized to being in the hospital.

On November 21, 2014 Rich was positive for edema and negative for chest pain and palpitations. (AR 1309). Findings on exam were normal with the exception of edema in the extremities. (AR 1310).

On December 26, 2014 Rich had no back pain, normal range of motion, and was cooperative. (AR 1243–44). The impression was borderline cardiomegaly with no active disease. (AR 1245).

On December 27, 2014 Rich was cooperative with appropriate mood and affect. (AR 1152). There was no radiographic evidence of acute cardiopulmonary disease. (AR 1154). An electrocardiogram was normal. (AR 1163).

B.     State-Agency Consulting Physicians

On March 17, 2011 Rich saw Dr. Noelle Rohen for a psychological evaluation. (AR 324). Rich complained of moodiness and stated she became easily frustrated by her limitations. Her irritability manifests through yelling, and she was angry that her husband had to do most of the housework. She reported sleeping poorly because of pain, low energy during the day, napping during the day, and being forgetful and inattentive. Dr. Rohen noted Rich was not currently being treating for mental health issues, but her doctor had recommended counseling. (AR 325). On the mental status exam, Rich was cooperative with good eye contact, and her thoughts were linear and coherent. Her "[a]ffect was initially suggestive of defensiveness and irritability, but quickly became unremarkable as she relaxed." She scored 29 out of 30 on the Folstein Mini Mental Status Examination, was alert and oriented, and memory processes appeared intact. (AR 326). Dr. Rohen assessed major depressive disorder, single episode, chronic, moderate, and observed that Rich's depression had developed in the context of her deteriorating health and might mildly impact her ability to work.

Dr. Rohen also completed a Medical Source Statement and opined that Rich's condition would impose limitations for 12 months. (AR 327). Dr. Rohen noted that Rich's understanding and memory were grossly intact, and that her sustained concentration and persistence were grossly intact but that Rich reported her persistence at home was impacted by pain. Dr. Rohen also noted that while Rich reported "problems with irritability, and one might expect these to have some impact on work relationships . . . thus far, she does not report theses having historically been a problem." Dr. Rohen

opined that Rich was capable of adapting to minor changes in the workplace, if her physical conditions permit her.

On November 20, 2012 Rich saw Dr. Hunter Youst for a psychiatric evaluation. (AR 840). Rich admitted some suicidal ideation out of frustration in dealing with the Social Security Department, and reported frustration because of her chronic health problems, not qualifying for AHCCCS, and having to reapply for social security benefits. (AR 840–41). She denied any specific anxiety symptoms. (AR 840). Rich said that she wakes up between 1–3 a.m. because she sleeps on and off throughout the day, and that she typically does nothing except watch TV, go to the bathroom, and eat. (AR 841). On exam, she "presented in an extremely angry manner saying that her anger was directed towards DES and how her social security case has been handled." Her overall mood was depressed, her insight and judgment were poor, and she scored 30 out of 30 on the mini-mental status exam. The diagnosis was mood disorder with moderate depressive features due to multiple medical conditions, and personality disorder not otherwise specified. (AR 842).

Dr. Youst also completed a Medical Source Statement and opined that Rich's condition would impose limitations for 12 months. (AR 843). He opined that she had no limitations in understanding and memory or concentration and persistence, but that she "demonstrated significant anger during the evaluation and would have difficulty responding to supervision and coworkers." Dr. Youst also opined that "[w]ith her prominent angry attitude, Ms. Rich would likely be unsuccessful in a job interview as well as getting along with supervisors and coworkers."

C.    State-Agency Reviewing Physicians

On November 29, 2012 DDS physician Dr. Lloyd Anderson made an initial determination that Rich was not disabled. (AR 49). Dr. Anderson completed a RFC assessment with the following limitations: occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; stand and walk 6 hours; sit 6 hours; unlimited pushing and pulling; frequently stoop; never climb ladders and ropes; occasionally climb

ramps and stairs, balance, kneel, crouch, and crawl; and avoid moderate exposure to fumes, odors, dust, gases, and poor ventilation. (AR 60–61). Rich's RFC was for light work and no finding was made regarding her PRW because she could adjust to other work. (AR 63). Dr. Foster-Valdez completed a psychiatric review and opined that Rich's mental impairments were non-severe. (AR 58). She found that Rich had mild difficulties in maintaining social functioning and no other difficulties under the Paragraph B criteria. (AR 57). Dr. Foster-Valdez noted that Rich was not taking any psychiatric medications or in mental health treatment, had not sought mental health treatment, and that her mental health condition was largely reactional to situations that were not going as she wanted. (AR 58). Dr. Foster-Valdez also noted that the CEs were generally consistent because Rich did not demonstrate a history of psychiatric issues and was unhappy with her current situation. (AR 59).

On reconsideration, Rich was again found not disabled on May 31, 2013. (AR 64). Dr. John Fahlberg made the same RFC assessment as Dr. Anderson (AR 75–77), and Dr. Ronald Nathan reaffirmed Dr. Foster-Valdez's psychiatric assessment (AR 74).

D.     Additional Medical Information

Dr. Doe completed a residual functional capacity form, undated. (AR 865). He reported that Rich had constant pain in her right knee, and pain in both legs and feet. Her diagnosis was diabetic neuropathy, arthritis in right hand, and peripheral arterial disease. Dr. Doe opined that Rich could stand for one hour, sit for one hour, walk for 50 feet, lift and carry 5–10 pounds, lift and carry less than 5 pounds several times a day, and needed to lie down during the day. Dr. Doe further opined that Rich's conditions prevented her from lifting, bending, squatting, and kneeling. (AR 865–66). He stated she could not return to her previous employment because it required her to sit continuously for 8 hours. (AR 866).

E.     Plaintiff's Testimony

On a Disability Report dated August 9, 2012, Rich reported that she stopped working on January 5, 2008 due to her conditions and for other reasons. (AR 170). She

was experiencing pain when walking, doing housework, sitting, and driving, and thought it was due to other medical issues she was having; she had a hysterectomy in 2005, gallbladder removal in 2007, and an arterial abdominal bypass in April 2007. Her pain got worse after her femur to femur bypass in May 2011; that is when she started to have numbness in her thighs and knees, and needle-type pains in her legs. Rich reported her pain was a 6–10 and woke her at night. She was once very active but stated it was now difficult for her to even walk and that over the last year she fell several times when her legs went numb and she lost her balance. (AR 181). Her pain was getting worse and preventing her from getting around, sitting, standing, doing laundry, cleaning, cooking, and socializing.

On a Function Report dated September 5, 2012, Rich stated that her illness prevented her from sitting or standing for long periods of time and that she lost her balance due to numbness in her legs. (AR 199). She fell 4–5 times in the previous year from losing her balance. (AR 206). Some days she could not get out of bed because of her pain medications, and some days she only slept for 2–3 hours at a time. Her conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, and use her hands. (AR 204). Rich stated she spent her days playing computer games, helping care for her grandchildren, and picking up after herself, and that on really bad days she slept all day. (AR 200). She needed help dressing, getting in/out of the tub, shaving her legs, and reminders to take her medications. (AR 201). She prepared easy meals for herself, dusted, and folded laundry, and could shop in stores and online. (AR 201–02). She did not go out alone or drive because of the numbness and pain in her legs. (AR 202). Rich reported that her hobbies were doing crafts, playing computer games, and watching TV, and that she communicated with others daily by phone or Facebook. (AR 203). She stated she had no problems getting along with family, friends, neighbors, or others, and that she got along with authority figures if they explained themselves properly and didn't give her the runaround. (AR 204–05). She could follow written and spoken instructions, accepted that changes were a part of life, and dealt with

stress the best she could with her pain.

On a Disability Report—Appeal dated January 4, 2013, Rich stated that since she last completed a report, she had more pain in her hips, back, and legs, and that she could no longer take all of her prescriptions because she had no insurance. (AR 209). She also reported that her husband helped her more with bathing and dressing, and that he did more of the household chores. (AR 214).

On an Exertional Daily Activities Questionnaire dated May 10, 2013, Rich stated that due to increasing numbness and pain in her legs, she could not do much except lay in bed all day. (AR 219). She was lethargic due to her medications and lack of activity, and had shooting and throbbing pain in her legs, back, and feet, and when her legs went numb she could not put any weight on them. Her day started at 3 or 4 a.m.; she would make coffee and then alternate between spending time on the computer, resting/napping, and eating, until bed between 7 and 9 p.m. When she could keep her pain to a minimum, she could shop without using a motorized cart. Rich reported that she could lift small bags and her 11 lb. dog, that she could fold laundry and tidy but not sweep, mop, or vacuum, and that she did not go anywhere alone for fear of losing her balance or having a panic attack. (AR 220). She did not drive because she feared causing an accident due to her legs, and her only activities were shopping and going to doctor appointments.

Rich testified at her hearing before the ALJ on October 24, 2014. She stated that her conditions had gotten worse since 2012 because she had more pain in her back, hips, and legs from neuropathy, and that she had good and bad months with her heart condition and had to take more nitroglycerin for her chest pain. (AR 39–40). Rich stated that her kidney problems had not gotten worse. (AR 40). Rich had several falls from her neuropathy because her legs got numb. (AR 42). She lies down during the day to ease her pain and takes Oxycodone and Morphine, and had more bad days than good days. (AR 42–43).

When asked by her attorney whether she had issues getting along with people, Rich testified that it depends on the situation and what her pain levels are, and that she

gets frustrated when she tries to explain something and people don't understand. (AR 43). When asked whether she had problems getting along with her coworkers, Rich stated the only ones she had a problem with were young girls at the call center who would get loud and use the "F" word, and Rich would get frustrated because the clients could hear and it would make the company look bad. Rich then agreed with her attorney that she had some conflict with her coworkers in the past.

F. <u>Lay Testimony</u>

Rich's husband, Daniel Rich, completed a Third Party Function Report dated September 4, 2012. (AR 191). Daniel reported that Rich could only sleep for 2–3 hours at a time and that she needed help dressing, getting in/out of the tub, shaving, walking upstairs, and balancing. Her conditions affected her ability to lift, squat, bend, stand, walk, sit, kneel, climb stairs, complete tasks, and use her hands. (AR 196). She had constant pain in her back and legs, and her symptoms were very bad some days, especially after heavy activity the day before. (AR 198). Daniel stated that Rich occasionally helped care for their grandchildren, but that he bathed, fed, and supervised them the majority of the time. (AR 192). She could prepare frozen dinners and snacks, fold laundry, and dust. (AR 193). She did not go out alone because leg pain affected her balance and she did not drive because she was afraid of her legs going numb. (AR 194). She could shop online and in stores. Daniel reported his wife's interests and hobbies as watching TV, playing computer games, and working on crafts and family projects, and stated she communicated with family and friends daily through phone and Facebook. (AR 195). He stated she had no problems getting along with family, friends, neighbors, or others (AR 196), but that she had some frustration when authority figures did not explain situations or gave her the runaround (AR 197). She could handle stress "as well as most" but it exacerbated her pain sometimes, and she handled changes in her routine "the same as most people" by accepting them and making the changes. (AR 197). She could finish what she started and follow both written and oral instructions. (AR 196).

An undated letter[4] from Rich's sister states that at one time Rich was very active and outgoing but things became too hard for her to handle because of the pain. (AR 237). The letter further states that Rich tried to go out with her sister recently but they weren't out for more than 30 minutes before Rich developed extreme pain and had to stop.

G.    Vocational Testimony

At the hearing before the ALJ, Sandra Trost testified as a vocational expert. She stated that Rich's past work at the call center was classified as an information clerk and sedentary, and that her work at the convenience store was classified as a cashier and light. (AR 46–47). Trost agreed with the ALJ that work as a convenience store cashier requires dealing with the public who may be smokers or highly perfumed, and testified that a call center job would not involve even moderate exposure to airborne irritants. (AR 47). Rich's attorney did not ask Trost any questions.

H.    ALJ's Findings

The ALJ found that Rich had the severe impairments of diabetes mellitus with neuropathy, peripheral vascular disease, coronary artery disease, and morbid obesity. (AR 21). The ALJ noted that these impairments caused more than a minimal effect on Rich's ability to do work activities and were therefore severe.

The ALJ also considered the Paragraph B criteria set out in the social security disability regulations for evaluating mental disorders. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00. The ALJ found Rich had no limitations in ADL, mild limitations in social functioning, no limitations maintaining concentration, persistence, or pace, and had no episodes of decompensation of an extended duration. (AR 22). Because Rich did not have at least two "marked" limitations, the Paragraph B criteria were not satisfied and Rich's depression was non-severe.[5]

_____

[4] A letter from Rich's attorney to the social security office is dated August 26, 2014 (AR 238), but there is no date on the letter from Rich's sister.

[5] To satisfy the paragraph B criteria, the mental disorder must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00.

The ALJ found that Rich's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible because they were not consistent with the medical evidence, because Rich did not comply with her doctors' recommendations, and because Rich only worked sporadically prior to her AOD. (AR 25–26).

The ALJ declined to give significant weight to the lay witness opinions because they were not medically trained and therefore the accuracy of their statements was questionable, because they were not disinterested third parties and their testimony might be colored by affection for Rich, and, "most importantly," because the statements were not consistent with the preponderance of the medical records. (AR 27).

The ALJ gave little weight to Dr. Doe's opinion because although Rich "was under the care of the doctor's practice, his relationship with the claimant was limited to a few encounters between March 2013 and June 2013 . . . [and he] did not have the benefit of reviewing the other medical reports contained in the current record." (AR 27).

The ALJ gave "due consideration" to the reports of the psychiatric CEs Dr. Rohen and Dr. Yost, but found that elements of Dr. Yost's opinion were too restrictive based on the medical record as a whole. (AR 27). The ALJ also noted that the consulting physicians only examined Rich once and had no treating relationship with her, which rendered their opinions less persuasive.

The ALJ gave great weight to the state agency reviewing physician assessments "because not only were they rendered by expert medical personnel but they are consistent with the other objective medical evidence of record . . . [and] the claimant's alleged [ADL]." (AR 27).

The ALJ found that Rich could perform her PRW as an information clerk both as actually and generally performed. (AR 28). The ALJ therefore concluded Rich was not disabled. (AR 28).

### III.   Standard of Review

The Commissioner employs a five-step sequential process to evaluate SSI and

DIB claims. 20 C.F.R. §§ 404.920, 416.1520; *see also Heckler v. Campbell*, 461 U.S. 458, 460–462 (1983). To establish disability the claimant bears the burden of showing she (1) is not working; (2) has a severe physical or mental impairment; (3) the impairment meets or equals the requirements of a listed impairment; and (4) the claimant's RFC precludes her from performing her past work. 20 C.F.R. §§ 404.920(a)(4), 416.1520(a)(4). At Step Five, the burden shifts to the Commissioner to show that the claimant has the RFC to perform other work that exists in substantial numbers in the national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, she does not proceed to the next step. 20 C.F.R. §§ 404.920(a)(4), 416.1520(a)(4).

Here, Rich was denied at Step Four of the evaluation process. Step Four requires a determination of whether the claimant has sufficient RFC to perform past work. 20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is defined as that which an individual can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. An RFC finding is based on the record as a whole, including all physical and mental limitations, whether severe or not, and all symptoms. Social Security Ruling (SSR) 96-8p. If the ALJ concludes the claimant has the RFC to perform past work, the claim is denied. 20 C.F.R. §§ 404.1520(f), 416.920(f).

The findings of the Commissioner are meant to be conclusive. 42 U.S.C. §§ 405(g), 1383(c)(3). The court may overturn the decision to deny benefits only "when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001). As set forth in 42 U.S.C. § 405(g), "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Valentine*, 574 F.3d at 690 (internal quotation marks and citations omitted), and is "more than a mere scintilla, but less than a preponderance." *Aukland*, 257 F.3d at 1035. The

Commissioner's decision, however, "cannot be affirmed simply by isolating a specific quantum of supporting evidence." *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998) (internal citations omitted). "Rather, a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the Secretary's conclusion." *Aukland*, 257 F.3d at 1035 (internal quotations and citations omitted).

The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation, [the court] must defer to the ALJ's conclusion." *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). This is so because "[t]he [ALJ] and not the reviewing court must resolve conflicts in evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (internal citations omitted).

Additionally, "[a] decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). The claimant bears the burden to prove any error is harmful. *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011) (citing *Shinseki v. Sanders*, 556 U.S. 396, 129 S. Ct. 1696, 1706 (2009)). An error is harmless where it is "inconsequential to the ultimate nondisability determination." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (internal citations omitted); *see also Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006). "[I]n each case [the court] look[s] at the record as a whole to determine whether the error alters the outcome of the case." *Molina*, 674 F.3d at 1115. In other words, "an error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error does not negate the validity of the ALJ's ultimate conclusion." *Id*. (internal quotation marks and citations omitted). Finally, "[a] claimant is not entitled to benefits under the statute unless the claimant is, in fact, disabled, no matter how egregious the ALJ's errors may be." *Strauss v. Comm'r Soc. Sec.*, 635 F.3d 1135, 1138 (9th Cir. 2011).

. . .

## IV.    Analysis

Rich argues that the ALJ erred by finding that her major depression was not a severe impairment and by failing to include any mental limitations in the RFC assessment. (Doc. 25). Rich also argues that the ALJ erred in adopting a light RFC because Dr. Doe's report supports a less than sedentary RFC. Rich contends that the ALJ's decision is not supported by substantial evidence and requests that the Court remand this matter for further proceedings. (Doc. 27 at 5–6).

The Commissioner argues that the Court should affirm the ALJ's decision because substantial evidence supports the ALJ's finding that Rich's depression was not severe during the relevant period. (Doc. 26 at 4). Defendant further argues that the ALJ properly discounted Dr. Doe's opinion and gave greater weight to the state agency consulting physician opinions. *Id.* at 10. Defendant requests that this Court affirm the Commissioner's decision because the "ALJ's findings are supported by substantial evidence and free of harmful error." *Id.* at 17.

The Court finds no error in the ALJ's finding that Rich's depression was non-severe. The Court further finds that the ALJ did not err by failing to include any mental limitations in the RFC assessment. Finally, the Court concludes that the ALJ properly gave specific and legitimate reasons for assigning less weight to Dr. Doe's treating physician opinion. Accordingly, the Commissioner's decision will be affirmed.

### A.    Non-Severe Depression Finding

Rich first argues that her major depression is a severe impairment. "At step two of the five-step sequential inquiry, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments." *Smolen v. Chater*, 80 F.3d 1273, 1289–90 (9th Cir. 1996). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)).

Mental impairments are evaluated using the technique outlined in 20 C.F.R. §

404.1520a (2017). The Commissioner must first evaluate the claimant's symptoms, signs, and laboratory findings to determine whether the claimant has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b). If the Commissioner determines that the claimant does have a medically determinable mental impairment, the Commissioner must specify the findings that substantiate the presence of the impairment, and then rate the degree of functional limitation resulting from the impairment. *Id.* The Commissioner considers four areas of functional limitation: ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. 20 C.F.R. § 404.1520a(c)(4).[6] The degree of limitation is rated as none, mild, moderate, marked, or extreme. *Id.* The Commissioner then determines the severity of the mental impairment. 20 C.F.R. § 404.1520a(d). If the Commissioner rates the degree of limitation as "none" or "mild," the Commissioner will generally conclude that the impairment is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities. *Id.*

In analyzing Rich's depressive disorder under the Paragraph B criteria, the ALJ found that Rich had no functional limitations in ADL because she was able to prepare meals, perform light housework, help care for her grandchildren, go outside daily, shop in stores and online, handle her finances, watch TV, play computer games, do crafts, and perform personal care. (AR 22). The ALJ also found that Rich had no limitations in concentration, persistence, or pace because she reported no issues with following instructions, and that she had no episodes of decompensation. The ALJ found that Rich had only mild limitations in social functioning and noted that she lived with her family, talked on the phone, used social media, and attended family functions and doctor appointments. The ALJ also noted that Rich had "never sought or received mental healthcare treatment from a specialist; all treatment has been rendered by a general

---

[6] The prior version of the regulation referred to these four areas as: "Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3) (effective June 13, 2011 to January 16, 2017).

practitioner." (AR 23).

Rich contends that "[t]he medical records listed in the Statement of Facts [in Rich's opening brief] clearly show that Ms. Rich's depression is consistent and severe[]" and that "[t]he preponderance of evidence indicates that Ms. Rich has a significant history of irritability, the inability to get along with other's [sic] (including treating physicians), refusing medical care, and accusing physicians of giving her medications to keep her hospitalized against her will." (Doc. 25 at 13–14). The Court disagrees.

The record reflects that Rich had some struggles with depression and anxiety related to her frustrations with her medical conditions and the process of applying for DIB. However, Rich was often observed to be calm, appropriate, have a normal mood and normal affect, and have no unusual evidence of anxiety or depression. She attended many medical appointments over the years where she did not raise any concerns regarding depression, and often denied experiencing any mental health issues. While there were several instances of Rich being irritated with her medical providers, the record hardly supports Rich's assertion of a "significant history of irritability," and there is essentially no evidence of an inability to get along with friends, family, coworkers, supervisors, or the general public. Times that Rich refused medical treatment appear to be directly related to her lack of insurance and inability to afford medical care, and the incident where she accused hospital staff of giving her medications to make her ill occurred well after the relevant period and was an isolated occurrence. While Rich contends that the "ALJ cannot selectively review records" to find Rich's depression non-severe (Doc. 25 at 14–15), that is precisely what Rich is asking the Court to do here by pointing to select evidence that *may* support a finding of severe depression without considering the record as a whole.

The ALJ's finding is also consistent with Dr. Rohen's opinion that Rich's depression had developed in the context of her deteriorating health and might mildly impact her ability to work, and that Rich had no problems with understanding, memory, concentration, or persistence, no history of problems with work relationships, and was

capable of adapting to minor changes in the work place. (AR 326–27). Likewise, the ALJ's finding is also consistent with Dr. Youst's opinion that Rich had no limitations in understanding, memory, concentration, or persistence. (AR 843). While Dr. Youst did opine that Rich would have difficulty responding to supervision and coworkers due to her angry attitude, as Dr. Rohen noted, Rich had no history of problems in the workplace, and Rich herself stated that her anger was directed at DES and problems with her social security case.

In sum, taken all together, substantial evidence in the record supports the ALJ's finding that Rich's depression was not a severe impairment.

B.    Light RFC Assessment

Rich argues that the ALJ's light RFC assessment is not supported by substantial evidence because the ALJ erred in discounting Dr. Doe's treating physician opinion.

i.    RFC

Residual functional capacity is "the most [a claimant] can still do despite her limitations," and includes assessment of the claimant's "impairment(s), and any related symptoms, such as pain, [which] may cause physical and mental limitations that affect what she can do in a work setting." 20 C.F.R. § 404.1545(a)(1). The Commissioner retains the ultimate responsibility for assessing a claimant's RFC. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). The ALJ was required to assess Rich's RFC based on all the record evidence, including medical sources, examinations, and information provided by Rich. 20 C.F.R. §§ 404.1545(a)(1)–(3), 416.945(a)(1)–(3). However, the ALJ need not include all possible limitations in his assessment of what a claimant can do, but rather is only required to ensure that the RFC "contain[s] all the limitations that the ALJ found credible and supported by the substantial evidence in the record." *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005).

Here, the ALJ found that Rich had the capacity to perform light work[7] with the

_____

[7] As defined by 20 C.F.R. 404.1567(b): "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires

1  following limitations: never climb ladders, ropes, or scaffolds; occasionally climb ramps

2  and stairs, balance, kneel, crouch, and crawl; frequently stoop; and avoid concentrated

3  exposure to extreme cold, fumes, odors, dust, gases, poor ventilation, and hazards. (AR

4  24).[8] While the ALJ assessed a light RFC, the ALJ found that Rich could perform her

5  PRW as an information clerk, which is classified as sedentary.[9]

6          ii.    Weighing Medical Testimony

7          Rich challenges the ALJ's RFC assessment based on the weighing of Dr. Doe's

8  medical opinion.

9          In weighing medical source opinions in Social Security cases, the Ninth Circuit

10  distinguishes among three types of physicians: (1) treating physicians, who actually treat

11  the claimant; (2) examining physicians, who examine but do not treat the claimant; and

12  (3) non-examining physicians, who neither treat nor examine the claimant. *Lester v.*

13  *Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "As a general rule, more weight should be

---

14

15  a good deal of walking or standing, or when it involves sitting most of the time with some
    pushing and pulling of arm or leg controls. To be considered capable of performing a full
16  or wide range of light work, you must have the ability to do substantially all of these
    activities. If someone can do light work, we determine that he or she can also do
17  sedentary work, unless there are additional limiting factors such as loss of fine dexterity
    or inability to sit for long periods of time."

18          [8] In making this finding, the ALJ noted the following medical evidence: an EMG
19  in January 2012 was normal; in December 2012 Rich was stable on insulin and her
    diabetes was improving in June 2013; in April and June 2012 Rich's kidney disease was
20  stable; in January 2012 Rich was walking with a normal gait and in May 2012 she was
    not having any bursitis pain; in September 2012 Rich complained of pain in her hips,
21  lower back, and legs but clinically did not have active synovitis suggesting an
    inflammatory process and her pain was probably related to long-term diabetes and
22  neuropathy; an x-ray of the hips in September 2012 showed normal osseous alignment
    with no significant arthritis; an x-ray of the pelvis in September 2012 showed coxa
23  profunda bilaterally and no fracture, dislocation, significant arthritis, or osseous erosion;
    a MRI of the lumbar spine in March 2013 showed mild degenerative disease and a small
24  aortic aneurysm likely not changed since the previous study in August 2011; in
    December 2011 at a follow-up for her coronary artery disease, Rich had no exertional
25  problems and no symptoms attributable to valvular heart disease and there was "a
    significant gap in further treatment [for this condition] until May 2014." (AR 25–26).

26          [9] As defined by 20 C.F.R. 404.1567(a): "Sedentary work involves lifting no more
27  than 10 pounds at a time and occasionally lifting or carrying articles like docket files,
    ledgers, and small tools. Although a sedentary job is defined as one which involves
28  sitting, a certain amount of walking and standing is often necessary in carrying out job
    duties. Jobs are sedentary if walking and standing are required occasionally and other
    sedentary criteria are met."

given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Lester*, 81 F.3d at 830). "Courts afford the medical opinions of treating physicians superior weight because these physicians are in a better position to know plaintiffs as individuals, and because the continuity of their treatment improves their ability to understand and assess an individual's medical concerns." *Potter v. Colvin*, 2015 WL 1966715, at *13 (N.D. Cal. Apr. 29, 2015). "While the opinion of a treating physician is thus entitled to greater weight than that of an examining physician, the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012.

Where a treating physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons. *Lester*, 81 F.3d at 830. "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence. This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be entitled to the greatest weight . . . even if it does not meet the test for controlling weight." *Garrison*, 759 F.3d at 1012 (internal quotations and citations omitted). Specific, legitimate reasons for rejecting a physician's opinion may include its reliance on a claimant's discredited subjective complaints, inconsistency with the medical records, inconsistency with a claimant's testimony, or inconsistency with a claimant's ADL. *Tommassetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008). "An ALJ can satisfy the substantial evidence requirement by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* However, "when evaluating conflicting medical opinions, an ALJ need not accept the opinion of a doctor if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Bayliss v. Barnhart*, 427

F.3d 1211, 1216 (9th Cir. 2005). Finally, if the ALJ determines that the plaintiff's subjective complaints are not credible, this is a sufficient reason for discounting a physician's opinion that is based on those subjective complaints. *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009).

Here, Dr. Doe completed a residual functional capacity form and stated that Rich had constant pain in her right knee, and pain in both legs and feet. (AR 865). Her diagnosis was diabetic neuropathy, arthritis in right hand, and peripheral arterial disease. Dr. Doe opined that Rich could stand for one hour, sit for one hour, walk for 50 feet, lift and carry 5–10 pounds, lift and carry less than 5 pounds several times a day, and needed to lie down during the day. Dr. Doe further opined that Rich's conditions prevented her from lifting, bending, squatting, and kneeling. (AR 865–66). He stated she could not return to her previous employment because it required her to sit continuously for 8 hours. (AR 866).

### iii.    Analysis

Here, Dr. Doe's opinion was contradicted by the opinion of non-examining DDS physician Dr. Anderson. Accordingly, the ALJ was required to provide specific and legitimate reasons to discount Dr. Doe's opinion. The Court finds that the ALJ met that standard here.

First, the ALJ gave little weight to Dr. Doe's opinion because although Rich was under the care of his practice, Dr. Doe only saw Rich several times between April and June of 2013. (AR 27). The Court finds that this is a specific and legitimate reason to assign less weight to Dr. Doe's opinion. "Generally, the longer a treating source has treated [the claimant] and the more times [the claimant has] been seen by a treating source, the more weight [the Commissioner] will give to the source's medical opinion." 20 C.F.R. § 404.1527(c)(2)(i). In addition, "the more knowledge a treating source has about [the claimant's] impairment(s) the more weight [the Commissioner] will give to the source's medical opinion." 20 C.F.R. § 404.1527(c)(2)(ii). While Dr. Doe may have reviewed Rich's patient file, he did not actually begin treating her until several months

after her DLI. Further, Dr. Doe's RFC assessment is undated, and he did not indicate whether his opinion applies retroactively. The relevant period for establishing Rich's disability is November 1, 2012 to December 31, 2012, but Dr. Doe did not actually see Rich until April 1, 2013, (AR 1106), and it is clear his opinion was not rendered until sometime after that. While Rich may have been under the care of other doctors at El Rio during the relevant period, Dr. Doe had no direct personal knowledge of Rich's conditions until he began treating her. *See Turner v. Comm'r Soc. Sec. Admin.*, 613 F.3d 1217, 1223 (9th Cir. 2010) (finding ALJ properly discounted treating physician's opinion that claimant was disabled and could not work where doctor's opinion was based almost entirely on claimant's self-report, doctor did not cite any objective tests to support his opinion, and doctor had no previous interaction with claimant and thus was in a poor position to assess claimant's complaints); *Magallanes v. Bowen*, 881 F.2d 747, 754 (9th Cir. 1989) (where treating physician did not actually treat the claimant until 2 1/2 years after the relevant period, doctor "had no direct personal knowledge of [claimant's] condition prior to [when he first saw her], and was thus scarcely different from any non-treating physician with respect to that time period.").

Second, the ALJ also gave little weight to Dr. Doe's opinion because he did not have the benefit of reviewing the other medical evidence in the record. (AR 27). "The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight [the Commissioner] will give that medical opinion." 20 C.F.R. § 404.1527(c)(3). In addition, "[t]he better an explanation a source provides for a medical opinion, the more weight [the Commissioner] will give that medical opinion." *Id.* The ALJ will also consider "the extent to which a medical source is familiar with the other information in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(6). In this case, Dr. Doe's RFC assessment does not indicate what information, if any, he reviewed before rendering his opinion. While he may have reviewed Rich's patient file for the El Rio clinic, he presumably did not review all of the records from her other medical providers. Other than noting that x-rays showed joint

narrowing and effusion, Dr. Doe failed to cite any clinical testing results or objective observations to support his conclusions as to Rich's RFC. Thus, given the lack of evidence cited by Dr. Doe to support his opinion, his limited explanation of Rich's limitations, and his unfamiliarity with the entirety of the medical record, the ALJ could properly assign reduced weight to Dr. Doe's opinion.

Finally, "[a]lthough a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). Thus, Dr. Doe's statement that Rich would never be able to return to work is not the equivalent to a finding of disability under the SSA. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). It is the role of the ALJ to determine whether a claimant is "disabled" within the meaning of the SSA, and that determination is based on both medical and vocational components. *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001).

The Court concludes that the ALJ could properly assign reduced weight to Dr. Doe's opinion where Dr. Doe did not actually treat Rich during the relevant period, did not indicate whether his RFC assessment was retroactive to the relevant period, and did not indicate what information, if any, he reviewed in the medical record before making his assessment. Because the ALJ gave at least one valid reason for assigning little weight to Dr. Doe's opinion, the ALJ's weight finding must be upheld. *See Batson*, 359 F.3d at 1198 (court must defer to ALJ's conclusion when evidence is subject to more than one rational interpretation); *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985) ("The medical evidence presented perhaps would permit a reasonable mind to make a finding of disability. It also would permit a finding of no disability. When there is evidence sufficient to support either outcome, we must affirm the decision actually made."); *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971) ("Where there is conflicting evidence sufficient to support either outcome, we must affirm the decision actually made.").

C.    RFC and Mental Limitations

Rich's third argument is that the ALJ erred in adopting a light RFC assessment that did not include any mental limitations. Rich states that even if she could physically perform her PRW, the RFC does not take into account any mental limitations, which would preclude her from all work.

As explained above, the Commissioner retains the ultimate responsibility for assessing a claimant's RFC, and the ALJ need not include all possible limitations in his assessment of what a claimant can do—the ALJ is only required to assess a RFC that "contain[s] all the limitations that the ALJ found credible and supported by the substantial evidence in the record." *Bayliss*, 427 F.3d at 1217; *see also Dschaak v. Colvin*, 2015 WL 181803, *3 (D. Or. Jan. 14, 2015) ("An ALJ's RFC need only incorporate credible limitations supported by substantial evidence in the record and must be consistent with the restrictions identified in the medical testimony."). As to Rich's alleged mental limitations, Dr. Rohen assessed essentially no limitations—she found that Rich had no problems with understanding, memory, concentration, or persistence, except that Rich reported her persistence at home was limited by pain. (AR 327). Dr. Rohen further noted that while Rich reported "problems with irritability, and one might expect these to have some impact on work relationships . . . thus far, she does not report theses having historically been a problem." Dr. Rohen also opined that Rich was capable of adapting to minor changes in the workplace, if her physical conditions permit her. Similarly, Dr. Youst also found that Rich had no limitations in understanding, memory, concentration, or persistence. (AR 843). While he opined that she would have difficulty responding to supervision and coworkers based on her anger during the evaluation, Rich has no history of problems in the workplace and she herself told Dr. Youst that her anger was directed toward DES.

Further, Rich stated on a Function Report that she had no problems getting along with family, friends, neighbors, or others, and that she got along with authority figures if they explained themselves properly and didn't give her the runaround. (AR 204–05). She

also stated that she could follow written and spoken instructions, accepted that changes were a part of life, and dealt with stress the best she could with her pain. Rich's husband similarly reported that she had no problems getting along with family, friends, neighbors, or others (AR 196), but that she had some frustration when authority figures did not explain situations or gave her the runaround (AR 197). He also stated that Rich could handle stress and changes in her routine as well as most people, that she could finish what she started, and could follow both written and oral instructions. (AR 196–97).

As discussed above, the record simply does not support Rich's allegation that she has "severe mental limitations," (Doc. 25 at 22), and the ALJ is not required to include limitations in the RFC that are not supported by substantial evidence in the record. Accordingly, the ALJ did not err by omitting any mental limitations from the RFC assessment.

**V.    Conclusion**

A federal court may affirm, modify, reverse, or remand a social security case. 42 U.S.C. § 405(g). Absent legal error or a lack of substantial evidence supporting the ALJ's findings, this Court is required to affirm the ALJ's decision. After considering the record as a whole, this Court simply determines whether there is substantial evidence for a reasonable trier of fact to accept as adequate to support the ALJ's decision. *Valentine*, 574 F.3d at 690.

Here, the undersigned finds that the ALJ's decision is supported by substantial evidence and is free from legal error. Accordingly, in light of the foregoing,

**IT IS HEREBY ORDERED** that the decision of the Commissioner of Social Security is **affirmed**. The Clerk shall enter judgment accordingly and close its file on this matter.

**IT IS FURTHER ORDERED** denying Plaintiff's Motion to Substitute Party. (Doc. 28).

**IT IS FURTHER ORDERED** denying the Motion to Amend Caption as moot. (Doc. 29).

Dated this 27th day of September, 2017.

Eric J. Markovich
United States Magistrate Judge